**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
WILLIAM BAEZ,                         :
                                      :
                Plaintiff,            :          96  Civ. 5025 (JFK)
        -against-                     :          **MEMORANDUM OPINION**
                                      :               **and ORDER**
                                      :
JO ANNE BARNHART,                     :
COMMISSIOER OF                        :
SOCIAL SECURITY,                      :
                                      :
                Defendant.            :
------------------------------X

<u>APPEARANCES</u>:

        For Plaintiff William Baez:

                Binder and Binder
                215 Park Avenue South
                6th Floor
                New York, New York 10003
                Of Counsel:    Charles E. Binder


        For Defendant Jo Anne Barnhart, Commissioner of Social
        Security:

                David N. Kelley
                United States Attorney for the
                Southern District of New York
                86 Chambers Street
                New York, New York  10007
                Of Counsel:    Lorraine S. Novinski



**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

Plaintiff William Baez brought this action seeking judicial review of the finding of defendant Jo Anne Barhnart, Commissioner of Social Security, that plaintiff is not disabled. Before the Court are the parties' cross-motions for judgment on the pleadings. For the reasons that follow, plaintiff's motion is denied in its entirety and defendant's motion is granted.

**FACTS**

The administrative record contains the following facts. Plaintiff was born in the Dominican Republic in 1953. R. 25, 36. He was 41 years old when he filed his applications for Supplemental Security Income ("SSI") and Social Security Disability ("SSD") benefits. R. 36. Previously, plaintiff had been employed in the United States since 1977 as a parking attendant, building superintendent, factory worker, forklift operator, and taxi driver. R. 25, 26. In 1992 he ceased working because of foot and ankle pain and diabetes. R. 88.

I.  <u>Administrative Proceedings</u>

Plaintiff filed for SSI and SSD benefits on August 16, 1994. R. 36-39, 52-54. The applications were denied, as was plaintiff's request for reconsideration. R. 40-51, 55-66. Plaintiff then requested a hearing before an administrative law judge. R. 65. Plaintiff was represented by counsel and testified at that first hearing on October 3, 1995. R. 22-35.

The ALJ issued a decision on October 23, 1995, finding that plaintiff was not disabled.  R. 12-16.  The Appeals Council denied plaintiff' request for review of that decision, R. 3-4, and plaintiff commenced this action.

The parties stipulated, on May 21, 1997, to a remand of the case to the Commissioner for further proceedings.  R. 303-04.  On October 3, 1997, the Appeals Council vacated its prior action, granted plaintiff's request for review, and remanded the case to an ALJ, because of the failure of the ALJ to consider the timely submitted report of a new treating physician, Dr. Roger Antoine. R. 305-07.

The second hearing was held on January 9, 1998.  R. 264. Plaintiff, again represented by counsel, appeared and testified, as did a medical expert, Dr. Plotz[1], and a vocational expert, Ms. Jonas.  R. 264-302.  The ALJ, in a decision dated March 28, 1998, found that Plaintiff was not disabled at any time through that date.  R. 255-61.  The Appeals Council denied plaintiff's request for review, and the ALJ's decision thus became final.  R. 212-13.

## II.  Claimant's Testimony and Work History

At various times, plaintiff described the physical requirements that his jobs entailed.  In his 1994 "Disability

---

[1]The transcript apparently misspells the name Plotz, as "Plause."

Report," plaintiff said the parking attendant job involved one hour a day of walking, five hours a day of sitting, occasional bending but no reaching, lifting, or carrying. R. 93. At the January 1998 hearing, plaintiff reported that the parking attendant job required standing all day except for one half-hour when he was parking the car. R. 270. He also reported in 1994 that his job as building superintendent involved sweeping and mopping the building, R. 92, but at the 1995 hearing, plaintiff testified that he had a helper who did the cleaning. R. 26. At the 1998 hearing, plaintiff said this job involved walking most of the time and lifting only a light tool box weighing about five pounds. R. 271.

At the 1995 hearing, plaintiff testified that he had no problems using public transportation, still had a driver's license, could walk a block or more without stopping, could stand for two to three minutes and sit for one-half an hour. R. 25-26, 30-31. He could lift up to ten pounds. R. 31. At the 1998 hearing, however, plaintiff testified that he could not use public transportation because he suffered from dizziness. R. 268. He also testified that he took his diabetes medication and stuck to his diet. R. 273. He took Motrin for his foot pain, which was effective but upset his stomach. R. 273-74. Plaintiff testified that he got dizzy when his blood sugar went up, and that his high cholesterol made him sleepy. R. 276-77. He

reported that he could walk half a block at a time, stand for two
to three minutes and sit for fifteen minutes; in an eight hour
day he could walk twenty-five minutes, stand ten or twelve
minutes and sit for almost twenty-five minutes.  R. 275-76.  He
added that he was afraid of dizziness from sitting for too long,
and that sitting caused his foot to hurt because of a circulation
problem.  R. 279-80.

    III.  <u>Medical Evidence</u>

    The first notation in the record of plaintiff' having been
treated for foot pain is dated March 22, 1994.  R. 172.  On that
date, plaintiff was seen at the Foot Clinics of New York for a
complaint of pain in his right ankle.  R. 172.  The examination
revealed ankle tenderness and edema, as well as scaling on the
plantar aspect.  R. 179.  An x-ray performed on the same date
revealed marked nonuniform narrowing in the ankle joint, and
neither traumatic arthritis nor Charcot ankle could be ruled out.
R. 179, 194.  Plaintiff was given an air cast to wear daily.  R.
180.

    On March 29, 1994, plaintiff reported chronic pain in the
ankle which he attributed to a sprain of the ankle a year
earlier, although there is no medical evidence in the record
reflecting such a sprain.  R. 182.  He reported that the air cast
provided some relief but the pain persisted.  R. 182.  The edema
was gone, but there was still tenderness, and the physician's

impression was traumatic arthritis.  R. 182.  Physical therapy
was recommended.  R. 182.  On April 8, 1994, plaintiff was
prescribed Motrin 600.  R. 185.  A week later Plaintiff reported
improvement with the Motrin and the air cast, and stated that his
diabetes was well-controlled.  R. 186.  An opthalmological exam
performed on April 21, 1994, showed no signs of diabetic
retinopathy.  R. 189.  On April 29, 1994, plaintiff reported
feeling much better and had no redness or edema of the ankle.  R.
188.  He was told to continue to wear the air cast and to avoid
too much exercise.  R. 188.  Plaintiff subsequently reported that
the ankle "brace" was helping to relieve the pain, but that the
pain persisted on rainy days.  R. 190.  He was diagnosed with
athlete's foot at that time.  R. 190.

Beginning on June 24, 1994, plaintiff received his medical
treatment at the New York Medical Group through the Health
Insurance Plan of Greater New York ("HIP").  R. 131.  On that
date plaintiff complained of foot pain.  R. 131.  He showed a
deformity of the ankle and walked with a painful gait.  R. 131.
On July 7, 1994, an orthopedic surgeon, Dr. Emmanuel, examined
plaintiff.  Plaintiff reported pain in his ankle and inability to
stand for long periods.  R. 130.  An x-ray of the same date
showed an old but mended fracture but did not show any recent
traumatic abnormality.  R. 122.  On July 20, 1994, Plaintiff
reported that his ankle had been painful for two or three months.

R. 121.  On July 27, 1994, Dr. Emmanuel wrote a letter for
plaintiff stating that plaintiff was "being followed" for pain in
the right ankle, and was tender on palpation of the ankle with
valgus deformity.  R. 119.  Dr. Emmanuel noted that plaintiff was
unable to do work that requires prolonged standing or walking.
R. 120.

On August 8, 1994, Dr. Itzkovitz reported that plaintiff was
being treated for insulin-dependent diabetes mellitus.  R. 118.
However, plaintiff was feeling "O.K." on that date even though he
was not checking his glucose levels nor was he taking his
cholesterol medication.  R. 126.  On November 14, 1994, plaintiff
asked for sleeping pills, had stopped taking his oral diabetes
medication, and reported chronic discomfort in the lower left
quadrant.  R. 128.

Some seven months later, on June 19, 1995, plaintiff visited
the facility again.  In the interim, he was a "no show" for two
appointments with a nutritionist.  R. 125-26.

Meanwhile, on November 21, 1994, plaintiff was examined by a
consulting physician, Dr. Graham.  R. 140-49.  Plaintiff reported
a one-year history of liver disease for which he took no
medication; a two-year history of pain in the right ankle for
which Motrin provided some relief and a seven-year history of
diabetes for which he took insulin.  R. 140.  He reported a
constant throbbing pain in the ankle but denied any problem

walking, except the occasional use of a cane.  R. 140.  He also
reported blurry vision and numbness and paresthesia in the
fingers and toes.  R. 140.

On examination, plaintiff's uncorrected visual acuity was
20/50 in each eye; he stood and walked normally and had no
difficulty dressing or getting on or off the examination table;
he had a full range of motion of all the joints without any pain,
swelling or redness; there was no evidence of muscle wasting; he
was unable to stand on his toes due to ankle pain, but he was
able to perform a full squat.  R. 141-42.  An x-ray of the right
ankle revealed mild degenerative changes and some evidence
consistent with old post-traumatic changes.  R. 146.

Dr. Graham's assessment was liver disease by history with no
clinical evidence of disease, joint pains by history with no
swelling or tenderness and no functional deficit; and diabetes
mellitus by history with no evidence of diabetic retinopathy.  R.
142.  Dr. Graham identified no limitations on plaintiff's ability
to perform such functions as sitting, standing, walking, lifting
and carrying.  R. 143.

Also during this period, two state agency physicians
reviewed the medical evidence in the file and offered their
assessments of plaintiff's ability to perform basic work
activities.  R. 102-17.  Each of these physicians reported that
plaintiff was able to lift twenty-five pounds frequently and

fifty pounds occasionally, stand or walk for about six hours in an eight-hour day and sit for about six hours in a day. R. 103, 111. Finally, on May 4, 1995, Dr. Emmanuel completed a form for plaintiff's attorneys on which she reiterated that plaintiff was not able to do prolonged standing or walking. R. 171.

When plaintiff returned to HIP on June 19, 1995, his only complaint was of a sore throat. R. 346. On subsequent visits, plaintiff reported pain in the chest and a tooth. R. 345. On September 22, 1995, Dr. Itzkovitz reported that plaintiff continued to wear the brace on his right leg, he was compliant with his medications and his glucose level was within the normal range. R. 344.

An October 11, 1995, entry by Dr. Antoine noted that plaintiff was status post fracture of the right ankle and was diabetic. R. 344. It is not clear whether these statements were based on a review of plaintiff's records or on an actual examination of plaintiff. R. 344. Also on that date, Dr. Antoine completed a form for plaintiff's attorneys. R. 311-12. He indicated that in an eight-hour day, plaintiff could sit and stand or walk for a total of zero to one hour each; he could occasionally lift up to five pounds. R. 311.

Dr. Antoine did see plaintiff on October 18, 1995. R. 343. At that time plaintiff complained of pain, stiffness and giving way of the right ankle. R. 343. Plaintiff was wearing the air

8

splint and was taking 400 milligrams of Motrin twice a day.  R. 343.  On a form completed for plaintiff's attorney on that date, Dr. Antoine stated that plaintiff was taking 800 milligrams of Motrin twice a day; he was unable to perform any full time work because he could not stand for long periods of time; and he had been disabled since 1991.  R. 309.

Plaintiff returned for follow-up visits for his diabetes in April, May, and June, 1996.  R.  339-41.  He was not adhering to the prescribed dosage of insulin; he was not keeping good records; and he was again a "no show" for an appointment with a nutritionist.  R. 339.

In December 1996, plaintiff said that he was taking the insulin as prescribed and his blood tests were good.  R. 335.  In January 1997, plaintiff reported fainting in the street when his blood sugar level was elevated.  R. 334.

On June 13, 1997, Dr. Itzkovitz reported that plaintiff was not checking his sugar levels as directed and he failed to produce his diary.  R. 333.  On June 16, 1997, Dr. Antoine reported that plaintiff continued to wear the air splint and he was walking with a cane.  R. 376.  On that same date, Dr. Antoine repeated his earlier assessment that plaintiff could not sit, stand or walk for more than an hour a day and could lift up to five pounds only occasionally.  R. 328.  Two weeks later, Dr. Antoine advised plaintiff's attorney that plaintiff was taking

Motrin and wearing his air splint.  R. 327.  He stated that plaintiff was unable to stand or walk for prolonged periods.  R. 327.

A July 1997 note reported that plaintiff's diabetes was difficult to control but his blood sugar levels were getting better.  R. 331.  In the following month plaintiff admitted that he had not been taking his insulin.  R. 330.  On January 28, 1998, Dr. Antoine stated, purportedly on behalf of Dr. Itzkovitz, that plaintiff had been unable to work since June 18, 1993.  R. 403.  On an undated report, Dr. Itzkovitz herself reported that she had first seen plaintiff in June 1994.  R. 398.

Dr. Plotz reviewed the evidence in the record and appeared at the January 9, 1998 hearing.  R. 281.  He testified the plaintiff had insulin dependent diabetes that was slightly brittle[2] but had not produced any complications.  R. 281.  Dr. Plotz explained that lowered, rather than elevated, blood sugar causes dizziness, and that elevated cholesterol does not produce the symptoms that plaintiff described.  R. 281.  Dr. Plotz noted that plaintiff reported that the pain in his ankle began in April or May of 1994, and that there was no evidence of any significant swelling.  R. 282.  Contrary to plaintiff's claim that a problem with his circulation caused pain in the ankle when he sat for too long, R. 280, Dr. Plotz testified that there was no medical

---

[2]The transcript misspells brittle as "bridle."

evidence of a circulation problem, nor was there any reason for plaintiff to have to elevate his foot.  R. 282.  He noted that plaintiff had "[n]ormal motion of the right ankle."  R. 282.

In Dr. Plotz's opinion, based on the medical record, plaintiff should be able to stand and walk for six hours in an eight-hour day, sit for eight hours and lift and carry twenty-five pounds.  R. 284.  There were no other limitations imposed by plaintiff's medically determinable impairments.  R. 284.  Dr. Plotz acknowledged that the record contained more restrictive assessments by plaintiff's treating sources, but in his opinion those assessments are "kind of absurd."  R. 284.  Specifically, he stated that the medical record contains "absolutely no basis" for Dr. Antoine's assessment that plaintiff could not sit, stand or walk for more than one hour or carry more than five pounds. R. 285.  Nor did Dr. Plotz believe that plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms that plaintiff alleged.  R. 285.

IV.  <u>Vocational Evidence</u>

Ms. Jonas[3], at the January 1998 hearing, testified that plaintiff's job as a parking attendant is considered light and unskilled work.  R. 297-98.  While the job of building superintendent usually involves medium exertion, as plaintiff described his performance of that job it involved only light

_____

[3]The transcript misspells Jonas as "Jones."

exertion.  R. 299.  Ms. Jonas testified that a hypothetical individual who was able to perform the activities described by Dr. Plotz, i.e., standing or walking for six hours, sitting for eight hours and lifting twenty-five pounds, would be able to perform both of these jobs.  R. 299.  If such an individual was required to use a cane for prolonged walking, Ms. Jonas testified, he would not be able to perform either of plaintiff's past jobs.  R. 299.  Such an individual, however, would be able to perform a number of sedentary jobs that exist in significant numbers in the national economy.  R. 299-301.  Finally, if a hypothetical individual had either all the functional limitations described by plaintiff at that hearing, or the restrictions identified in the record by Dr. Antoine, Ms. Jonas testified, such an individual would be unable to perform any jobs that exist in the national economy.  R. 301.

**DISCUSSION**

I.  <u>Standard of Review</u>

Under 42 U.S.C. § 405(g), the Commissioner's findings as to disability shall be conclusive if supported by substantial evidence.  Substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal quotation and citation omitted); <u>Blaylock-Taylor v. Barnhart</u>, No. 03 Civ. 3437 (JGK), 2005 WL

1337928 at *6 (S.D.N.Y. June 6, 2005). " A court may set aside a determination by the Commissioner only if it is based on legal error or is not supported by substantial evidence in the record." Blaylock-Taylor, 2005 WL 1337928 at *6 (citations omitted). Even if a court's independent analysis of the record would differ from the Commissioner's, the Commissioner's decision, when supported by substantial evidence, stands. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

## II.  Disability Defined

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted . . . not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). In addition, the impairment must be "of such severity that [claimant] is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration's regulations establish a five-step inquiry by which the Commissioner determines whether a claimant meets this definition. Schaal V. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Blaylock-Taylor, 2005 WL 1337928 at *6. The

Court of Appeals for the Second Circuit has summarized the method

of conducting the five-step inquiry as follows:

> First, the [Commissioner] considers whether the
> claimant is currently engaged in substantial gainful
> activity. If he is not, the [Commissioner] next
> considers whether the claimant has a "severe
> impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the
> claimant suffers such an impairment, the third inquiry
> is whether, based solely on medical evidence, the
> claimant has an impairment which is listed in Appendix
> 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as
> age, education, and work experience; the [Commissioner]
> presumes that a claimant who is afflicted with a
> "listed" impairment is unable to perform substantial
> gainful activity. Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work.
> Finally, if the claimant is unable to perform his past
> work, the [Commissioner] then determines whether there
> is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see

Blaylock-Taylor, 2005 WL 1337928 at *6-7 (quoting Shaw v. Chater,

221 F.3d 126, 132 (2d Cir. 2000)).

At steps one through four of the above analysis, the burden

of proof is on the claimant; if claimant satisfies this burden of

proof through step four, then at step five the burden of proof

shifts to the Commissioner. Blaylock-Taylor, 2005 WL 1337928 at

*7 (citing cases and statutes). In considering the above five

steps, the Commissioner may look to objective medical facts and

clinical findings; diagnoses or opinions based on such facts;

subjective evidence of pain or disability testified to by claimant or others; and claimant's age, educational background, and work history. <u>Rodriguez v. Barnhart</u>, No. 03 Civ. 7272 (RWS), 2004 WL 1970141 at *10 (S.D.N.Y. Aug. 23, 2004) (citing <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999)). Of these four factors , two are of particular relevance to the matter before the Court. First, under 20 C.F.R. § 404.1527(d), the weight to be accorded to a medical opinion varies based on the source of the opinion and the support for that opinion in the record. Generally, a treating physician's opinion gets more weight than the opinion of a non-treating physician if the treating physician's opinion is well-supported and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); <u>see</u> <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." <u>Snell</u>, 177 F.3d at 133. When the Commissioner does not give controlling weight to the opinion of a treating physician, he or she must explain why controlling weight was not given. 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); <u>see</u> <u>Snell</u>, 177 F.3d at 133.

Second, under 42 U.S.C. § 423(d)(5)(A), a claimant's report of pain or other symptoms will not be sufficient to establish disability in the absence of medical findings of an impairment that could reasonably be expected to produce the pain alleged. See also 20 C.F.R. § 404.1529(a); Snell, 177 F.3d at 135. Only after a claimant establishes an underlying physical impairment that could reasonably be expected to produce the claimant's symptoms must the adjudicator assess the claimant's credibility by evaluating additional factors to "determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. July 2, 1996).

At the end of the day, the ALJ must weigh all evidence and make his or her own determination of disability. The Commissioner must resolve genuine conflicts in the medical evidence, see Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002), and it is "up to the agency . . . to weigh the conflicting evidence." Clark v. Comm'r, 143 F.3d 115, 118 (2d Cir. 1998).

**APPLICATION**

The ALJ denied plaintiff' application for benefits at step four of the five-step analysis outlined above. At that point, the burden was on plaintiff to demonstrate inability to do his past relevant work, i.e., as a parking attendant or building superintendent. The ALJ found that plaintiff could perform the

activities required, based on the testimony of Dr. Plotz and the medical reports in the record. This Court finds that the ALJ applied the correct legal standards in making his determination, and that substantial evidence supports the ALJ's ruling.[4]

The ALJ properly relied on the medical evidence to support his finding that plaintiff is not disabled. First, the testimony of Dr. Plotz, the medical expert, emphasized that there was no medical evidence for the limitations that plaintiff alleged. Based on his reading of the medical record, Dr. Plotz assessed plaintiff's limitations as being much less severe than had Drs. Emmanuel and Antoine. In fact, Dr. Plotz considered those more limiting assessments "kind of absurd." R. 284.

Second, the administrative record included Dr. Graham's evaluation of plaintiff, as well as the reports of two non-examining consultants. Dr. Graham's examination of plaintiff revealed full range of motion in all joints, no pain or swelling, a normal walk (and plaintiff even denied difficulty in walking at this exam), x-ray findings of only mild degenerative changes to the ankle, and no functional deficit of the ankle. The two

[4]It is important to note that there is no issue as to the existence of plaintiff's impairments. Indeed, the medical evidence shows that plaintiff suffers from diabetes, high cholesterol, and the repercussions of an old ankle fracture. Rather, at issue here is the ALJ's determination that these impairments did not cause symptoms or limitations that prevented plaintiff from performing his past relevant work, thus precluding a finding of disability.

medical consultants, who also reviewed the evidence in the record, both opined that plaintiff could stand or walk for six hours, could sit for six hours, and could carry up to twenty-five pounds.

Plaintiff puts great importance on the opinions of Drs. Emmanuel and Antoine, who both opined that plaintiff is totally disabled and incapable of performing any work. Plaintiff urges that Drs. Emmanuel and Antoine are treating physicians, and that their opinions should therefore be accorded controlling weight.

This argument fails. While plaintiff may have visited Drs. Emmanuel and Antoine as treating physicians rather than as consulting physicians, he saw neither doctor enough – Dr. Emmanuel only once and Dr. Antoine three times – to require that their opinions override the substantial contradictory medical evidence. Moreover, the medical evidence revealed at the visits to those two physicians does nothing to advance plaintiff's claim. An x-ray on the same date as plaintiff's visit to Dr. Emmanuel showed no evidence of recent trauma to the ankle. Dr. Antoine's only actual medical findings were limitation on range of motion, status post ankle fracture and traumatic arthritis. However, both doctors made assessments based on those findings that contradicted all the other assessments in the record. Under these circumstances, the relevant laws and regulations did not require the ALJ to give special weight to the opinions of Drs.

Emmanuel and Antoine, or to give less weight to the opinions of the non-treating physicians whose opinions were well-supported with medical evidence.

The ALJ also properly determined that plaintiff's testimony was not credible based on the evidence before him. As required by the regulations, the ALJ gave more than a conclusory statement that he found plaintiff' testimony less than credible. The ALJ noted that plaintiff's testimony as to his pain and other symptoms and limitations was not supported by the medical evidence: No medically determinable impairments existed that could reasonably be expected to produce the symptoms plaintiff alleged. The record also discloses inconsistencies in plaintiff's testimony which are material. See supra pp. 2-4.

The record provides substantial evidence to support the ALJ's findings, and the ALJ committed no legal error in his evaluation of the evidence. The motion of the claimant is denied and the Commissioner's motion is granted.

CONCLUSION

For the reasons given above, plaintiff's motion is denied and the Commissioner's cross-motion for judgment on the pleadings is granted. The Court closes the case and orders its removal from the active docket.

SO ORDERED.

Dated:          New York, New York
                August 3 / , 2005

                                    _John F. Keenan_
                                    JOHN F. KEENAN
                                    United States District Judge